IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

February 03, 2015 Session


**DIMITRIE COLBERT v. STATE OF TENNESSEE**


**Appeal from the Criminal Court for Shelby County**
**No. 12-00762      J. Robert Carter, Jr., Judge**



**No. W2013-02768-CCA-R3-PC   -   Filed May 13, 2015**



The petitioner, Dimitrie Colbert, murdered his girlfriend and was subsequently charged with one count of first degree (felony) murder,   one count of first degree (premeditated) murder, one count of especially aggravated kidnapping, one count of aggravated rape, one count of aggravated kidnapping, and one count of evading arrest in a motor vehicle.   The State sought the death penalty.   Pursuant to a plea agreement, the petitioner pled guilty to one count of first degree (felony) murder and one count of evading arrest in a motor vehicle, a Class D felony.   He received an agreed-upon life sentence for the murder conviction and a consecutive four-year sentence for the evading arrest conviction.   The petitioner filed a timely post-conviction petition, alleging that trial counsel performed deficiently in investigating his mental health and in advising him to accept the plea offer. After a thorough review of the record, we conclude that the petitioner has not established that he received the ineffective assistance of counsel, and we affirm the judgment of the post-conviction court.



**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which CAMILLE R. MCMULLEN and ROGER A. PAGE, JJ., joined.

Douglas A. Trant, Knoxville, Tennessee, for the appellant, Dimitrie Colbert.

Herbert H. Slatery III, Attorney General and Reporter; J. Ross Dyer, Senior Counsel; Amy P. Weirich, District Attorney General; and Josh Corman, Assistant District Attorney

General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL AND PROCEDURAL HISTORY

The general facts and circumstances surrounding the murder were summarized by the prosecutor at the hearing on the plea agreement, which was introduced as an exhibit at the post-conviction hearing. According to the prosecutor, the petitioner killed the victim, his girlfriend Janette Corria, after abducting her:

> The facts giving rise to the indictment had the matter gone to trial would be that on August 28, 2011, at approximately 3:15 a.m., Memphis police received a call claiming Dimitrie Colbert had killed his girlfriend . . . and a body was in the back of Dimitrie Colbert's 2007 Ford 500 located 262 Chelsea here in Shelby County, Tennessee. There was a lengthy pursuit that ensued. The Ford driven by Dimitrie Colbert wrecked at Winchester and North Lauderdale, and after a short foot pursuit Colbert was taken into custody. [The victim] was found in the rear passenger floorboard. Paramedics made the scene and pronounced her dead at 4:20 a.m. She was taken to the Regional Forensic Center where Dr. Funte ruled the death a homicide due to several things [−] they couldn't really decide. Cause of death was determined to be homicidal violence. Dimitrie Colbert was taken to Homicide Office where he gave a statement admitting to having sexual relations, beating, shooting, choking, and running over [the victim] with his vehicle before she finally died. At one point she escaped and ran to somebody for help. The person would not help her. He forced her back into his car. It was learned that [the victim] showed up at her home at 7285 Holler here in Shelby County, Tennessee, around 10:30 p.m. on August 27th. The last person she was seen with was Dimitrie Colbert. [The victim's] purse, cell phone and a white T-shirt w[ere] found at the side of her house.

A more detailed account of the events that led to the victim's death was contained in the petitioner's statement to police. The petitioner was apprehended a short distance from his vehicle, which still contained the victim's body. He spent the day at the police station, speaking with investigators and eventually taking them to the crime scenes. The

petitioner then signed a formal statement detailing the victim's death:

About 8 pm I parked about three or four houses down from her house but she didn't get home until around 10:50 something. She pulled up in a white car with some guy driving. I knew that it was a guy from her job, I think his name is Vinny. That's the name that she had in her phone. He asked her was she going to be ok because he saw my car pull up and he saw me get out and run up to her and give her a hug. She told him (Vinny) that she would be ok when he asked. We kissed and started talking. We went to the side of the house and I was asking where what [sic] was going on and she said that the guy was just a friend.

We were both telling each other how much we missed each other. From that point on we started kissing and that's when she took off her handbag and she had raised my shirt up and I think I took it off, or maybe she did it. At some point she had my shirt in her hands. We was fixing to have sex on the side of her house but she was saying that she didn't want to do it outside. I asked her if she wanted to go to the car instead and she said yes.

We went to the car and I drove off to another neighborhood and we had sex. The neighborhood was somewhere off of Riverdale, over by the old Ryans. After we finished having sex we started talking some more. I was telling her that I wasn't going to hurt her. She was saying that she was scared and she was telling me that I was going to get in trouble because she was supposed to have been home by 11. But once we got to talking she said that she was going to text her dad and say that she was on the way. We just started talking and then she said that she was going to just call her dad and tell him that she was going to move in with me.

After we had sex we got on the interstate and we talked some more. I asked her for her phone and she gave it to me and said that she had nothing to hide. I seen that some dude had texted her and it said something like "baby, I'm outside." So after that I mugged her a little, not to hard, just a little. We were on the expressway and this was somewhere before

we got to Getwell. That was the last physical altercation until we got to Arkansas.

Once we got to Arkansas I noticed that I was running low on fuel and that I had to go get some gas. I had asked her if I could trust her to not try to do something stupid when we stopped for gas and as soon as I got out of the car at the gas station, she got out and ran to some guy at the gas pump. She ran up to him and was asking him for help, saying "help me, help me" and they was just looking at her. So I went up to her from behind and grabbed her around her waist and picked her up a little and then I set her down and she walked with me to the car. We got in the car and left out of the gas station and we just started driving around random neighborhoods because I felt that someone was following me from the gas station. While we was driving around I told her that I was going to have to put her in the trunk and go get some gas so that she wouldn't be yelling and try something stupid.

I had left and we kept driving and then I ended up on a very dark road and I pulled over to the side. We just started talking and she was telling me that she wanted to get married, that she loved me and that she was sorry for what she did, that she was just hurt. She said that she only loved me and she asked about our kids that we were going to have. Then after that I was telling her to be quiet and then I was telling her that I was going to kill her and then kill myself. Then I started smacking her in the face before I started punching her because I really didn't want to hit her with my fist, now I only hit her once with my fist. I remembered that I had a BB gun in the trunk. I made her come out of the car with me and I grabbed her by the hand and pulled her out on my side. She thought that I was going to put her in the trunk to suffocate her and she started freaking out. I opened and she was telling me not to put her in the trunk and she calmed down when she saw that I was only getting the BB gun out. We had got back in the car and that's when I pumped my BB gun about 8-10 times and shot her in the neck, on her left side. As soon as I shot her a big ball came popping out of her skin, it was a little

knot, a little smaller than a golf ball.  It was squirting blood out of it.  I turned the inside car light on to take a picture of her and I sent it to my mom.  During this same time, I ha[d] told her to look in to the mirror because she looked terrible and I wanted her to see what was happening to her. Before my mom called, [the victim] was telling me to shoot myself as well.  She also said that she wanted to die slowly in my arms. She said this when she saw me start pumping the BB gun the second time.  She said that she would be dead in ten minutes. Right after my mom and everyone else started calling my phone.  I told them that I had done something bad, she wasn't dead yet but in my eyes it was still bad.  That's when I hit her with the laptop in her head maybe twice.  I think the bottom part of it broke on the second hit.

That's when I got my BB gun again and I pumped it about 15 times or so and I shot her on the other side of the neck I think.  I just know that I put it up to her neck and pulled the trigger.  I pumped the BB gun about 8-10 times again, I was trying to hurry up and get it over with because I was scared, panicked, and stuff.  I didn't want anyone to pull up and see what was going on.  I shot her in the ear, the right one. I had tried to put the BB gun in her mouth after I shot her the second time, but she wouldn't open her mouth, so that's why I shot her in the ear.  I was thinking that it would have killed her faster if I shot her in the mouth.  I was going to stick the BB gun into the back of her throat and hopefully killed her faster.

After I shot her in the ear I started hitting her with the back of the BB gun but it broke so I hit her with the trigger part of it. It was probably four or five times. I hit her with the laptop again about three or four more times and after that the laptop was out of the picture. I got mad because none of this was working. I looked into my backseat and saw the power cord from the laptop so I reached back and grabbed. [The victim] was in the passenger seat and took the cord and wrapped it around her neck, but it wasn't on there good. I noticed that after the first time. I bent her over between the driver and passenger seat so that the bottom part of her

stomach was on the middle part and her legs were still in the front seat, and the rest of her was leaned over into the back seat. I put a foot on her and tried to strangle her, but it started hurting my hand, so I only did it for a minute or so. She was kicking and stuff and the cord was hurting my hand so I let her up.

I put her back in the passenger seat and she was up, like she was sitting in the seat, and her face was slightly towards the window and that's when I tried to do it a second time.  I had noticed that the cord was part on her eye instead of her neck and that was probably why it wasn't working so I pulled it down to her neck and I wrapped it around her neck like twice more and then I put my foot on her again and started pulling.  It was for the same amount of time as the first time.  My hand started hurting so I stopped again and I saw that she still wasn't dead.

So after that when I realized that the second time didn't kill her I pushed her out of the car.  When I pushed her out, I backed up and dodged her on purpose but I didn't see her so I got out to look for her because I thought she had got up and ran.  After I got out I saw her and that her legs were moving and so I returned to my vehicle and put it in drive and ran her over.  When I ran her over I put it in reverse and backed over her.  Then I put it in drive and ran over her again and then I put it in reverse and backed over her again.  At some point when I was running her over, I think that she got stuck under the car because when I came back for the last time to run her over and I did run her over, my car got stuck and it was just burning rubber and it wouldn't go anywhere.  I stopped and got out and I didn't see her body at the spot where I was running her over at.  I walked around my car looking for her and I looked under my car and saw a foot under the front right side.  I saw her white sock and I grabbed her foot and pulled her from underneath the car.  I pulled her right by my car door and put her in the back seat of my car.  I didn't want to leave her.

I drove off and went to a gas station and put a post on

Facebook, updating my status and it said "If you are reading this, it probably means that I am already dead, sorry God." At the gas station, I attempted to put on my security shirt and I saw all the blood on it and I knew that I couldn't put it on, so I took it off.   I just went in the gas station and decided to go in fast because I had a lot of blood on my hands, they were both covered in it, they looked like they were red.  I went to the register and said give me $20 on 17.  I hurried and walked out because I didn't want them to see the blood on my shorts. The guy working there looked at my hands and he looked like he wanted to ask me what happened but I didn't give him time.  I got the gas and left and headed back to Memphis. My sister called and said that my mom wanted to see me and I told her to meet me at my apartment.

I stopped at McDonald's on Union, near the Walgreens and UT, and went through the drive thru and got a large Powerade and the lady was asking me what happened to my hands and I told her that I had got to fighting.  When she gave my change back to me she said that I was scaring her with my hands. She was talking about the blood on my hands. It seemed like she was joking because she was smiling and didn't look scared.

I left and went and met my mom at my apartment and they were already there when I got there.  We talked for about fifteen minutes and they were asking where [the victim] was and I told them, in my backseat and they told me to let the window down.  My mom didn't want to see [the victim], but my brother and sister looked in the back seat and saw her. [The victim] was actually on the floor.   After that I told them to meet me at the shop on Dunlap because they was talking to[o] loud and I didn't want the neighbors hearing what was going on.   I went straight to the shop and my mom was trying to talk to me and I seen a police car creeping up.  The police car was acting like they was just driving by and when they went by me, I made a u-turn, and that's when the chase started.

I was just going through street after street.  I got on

the expressway because I was going to her house and I was going to surrender at her house but I changed my mind. I was actually going to crash into their house, grab the BB gun, and hope that the police would shoot me. But I thought about it, I had already killed her and I remembered that she was saying that she was sorry that she was leaving her little brother Ernesto. She was saying this in the car before she died. Instead of that I just kept driving. We just went street to street and before I knew it I was over off of Summer and then it turned into North Parkway. I sped up to about 105 and then I seen a police officer trying to put out some spikes so what I did was that I seen that he had the spikes out and I pretended that I was going to the right and when he moved them I went to the left and got around them.

That's when the chase led to Main and I turned on some more streets and one of them I turned to[o] fast and I hit the water hydrant. I jumped out and took off running and while I was running I thought that the police were going to taser me or put the dogs on me so I immediately stopped, paused, and put my hands in the air. I thought that they might want me to get on the ground so I laid down and that's when I looked up and I got hit. Some black officer hit me in the nuts and one hit me in the face. I don't even remember getting in the police car. Then they brought me down here. The paramedics came out there and he looked at me and said that I was going to be fine and walked off.

The petitioner's statement also included responses to specific questions asked by investigators. When asked when he decided to kill the victim, the petitioner stated that he did so after she tried to run away at the gas station because he "couldn't trust her not to say anything about the situation." The petitioner was charged with one count of first degree (felony) murder, one count of first degree (premeditated) murder, one count of especially aggravated kidnapping, one count of aggravated rape, one count of aggravated kidnapping, and one count of evading arrest in a motor vehicle. After the trial court denied the petitioner's motion to dismiss based on venue and motion to suppress his statement to police, the petitioner pled guilty to first degree (felony) murder and evading arrest in a motor vehicle. He received a negotiated sentence of life and a consecutive four-year term.

The petitioner filed a timely petition for post-conviction relief, and the petition was amended by appointed counsel. At the post-conviction hearing, the petitioner introduced witnesses to testify that he was genetically predisposed toward uncontrollable violence and that he was incapable of forming the *mens rea* to commit first degree murder.

Cindy Vnencak-Jones testified that she was the medical director of molecular diagnostics at Vanderbilt Medical Center and that she was certified as a clinical molecular geneticist. Dr. Vnencak-Jones testified that she studied a gene called Monoamine Oxidase A, which produces enzymes to break down neurotransmitters. This gene responds to a promoter region. Dr. Vnencak-Jones testified that the petitioner's gene had three repeats in the promoter region and that studies have confirmed that individuals who have three repeats and who suffered from severe child abuse are more at risk for violent behavior as adults. On cross-examination, she confirmed that both the genetic predisposition and maltreatment had to be present to make an individual more disposed to violence. She also acknowledged that an article she had published noted that any evidence that a defendant was predisposed to be violent could be used by the prosecution to further its case as well as by the defense in the sentencing phase of a capital case.

Dr. John McCoy, a clinical and forensic psychologist, testified that he met with the petitioner for two and one-half hours and reviewed the petitioner's medical records from prison. The petitioner was diagnosed by the medical staff of the prison with intermittent explosive disorder, post-traumatic stress disorder, and depression. Dr. McCoy testified that he believed that these diagnoses were not correct but that the petitioner's symptoms all stemmed from bipolar disorder. The petitioner had told Dr. McCoy that, between the time he was eight and eleven years old, his stepfather would berate and intimidate him, telling him things like "you're not my son" and "you are not good enough." The petitioner's stepfather also shoved him, and the petitioner saw his stepfather hit his mother.

Dr. McCoy testified that the petitioner would not be able to plan a homicide because of his bipolar disorder. Instead, he would become suddenly violent in an uncontrollable rage that could last for a whole day. Dr. McCoy acknowledged that he knew of no violent outbursts from the petitioner prior to the crime and that he had been paid $600 for the evaluation and $1,000 to testify. He testified that he was not familiar with the petitioner's statement to police, which described how he lay in wait for the victim, stopped to get gas during the crime, decided to kill her at the gas station because she ran away, and killed her with various implements over an extended period of time. When confronted with the petitioner's statement that he had been calm during the killing, Dr. McCoy responded, "[W]e have to keep in mind that he has a severe mental disorder . . . the lay term is that, you know, sometimes he is crazy." He further testified that he

"d[id]n't believe" the petitioner's statement and insisted that the petitioner was "in a blind rage."

Dr. McCoy gave further testimony on a second hearing date, during which certain of the petitioner's mental health records were also admitted into evidence. Dr. McCoy had again examined the petitioner and had examined certain mental evaluations made prior to the plea agreement. He testified that the petitioner was psychotic and delusional, believing, for example, that someone was tampering with his food and that he was hearing the victim's voice. He reiterated that the petitioner could not form the requisite mental state for premeditated murder and testified that he thought the prior mental evaluations were not relevant. He testified that the petitioner had been prone to anger and had knocked a hole in a wall when he was twelve years old. Dr. McCoy stated that, although the petitioner told police he was calm, schizophrenics and manics "always say stuff like that." Dr. McCoy insisted that the petitioner was in a violent rage, disorganized, and psychotic at the time of the murder. He testified that the petitioner's rage could affect his ability to deliberately kill or kidnap the victim.

The petitioner testified that his attorneys did not know and did not advise him that he was bipolar or that he had a genetic predisposition to violence. If he had known the proper medical diagnoses, it would have affected his decision to plead guilty, and he would only have pled guilty to second degree murder. The petitioner testified that he had feelings of anger that he was unable to control the majority of the time. He confirmed Dr. McCoy's testimony regarding his stepfather's treatment of him and stated that his stepfather beat his mother. He testified that he did not plan to kill the victim. The petitioner's testimony was that he did plan a homicide that night but his plan was to kill himself and not the victim and that he had tried to kill himself in the past by tying a sheet around his neck or thinking of running his car into a house. The petitioner went to a mental health facility when he was seventeen years old due to a misunderstanding stemming from a teacher's mistaken belief he had made an obscene gesture at her. The petitioner testified that trial counsel did not tell him the difference between a sentence of life without parole and a sentence of life with the possibility of parole. He acknowledged that the State was seeking the death penalty, that he had confessed to the crime, and that he had taken police to the crime scenes. He testified that trial counsel did not discuss the strengths and weaknesses of his case with him and that he did not know "what was going on" when he entered the plea. He acknowledged that he had not gone into a rage when he had a misunderstanding with his teacher or when he entered his plea.

The prosecutor in the petitioner's case testified that she met with defense counsel numerous times about the case. She thought the case was very strong, and she had filed a notice that the State would seek the death penalty. The prosecutor testified that the

State intended to go to trial and that she offered the plea agreement "with some degree of hesitation." Although she would not have agreed to a life sentence, she reluctantly offered a sentence of life plus four years in order to save the families the stress associated with trial. She testified that she "wasn't going to go any lower than that." The prosecutor concluded that the testimony regarding the petitioner's genetic predisposition would not have affected her evaluation of the case, and she stated that if the petition were granted, the State would again seek the death penalty.

Trial counsel testified that he was the supervisor of the capital defense team at the public defender's office and that he had tried over thirty death penalty cases. He testified that the petitioner's case was not a good case to take to trial and that his main goal had been to avoid the death penalty. He stated that he and his team would attempt to meet with clients weekly. He met with the petitioner's mother three to five times and with the petitioner's father once. Trial counsel testified that he had investigated the defendant's medical records and the possibility of child abuse and that the records did not indicate that the petitioner had been abused or had mental illness. The petitioner's mother was asked about abuse, although trial counsel did not recall being present when she was asked. Trial counsel first heard about the petitioner's stepfather's actions at the post-conviction hearing. The petitioner seemed to be a "good kid," and he had graduated high school. Trial counsel recalled no evidence that the petitioner was prone to rage and instead noted that his family described him as "happy[-]go[-]lucky" and that his statement to police indicated he was not enraged. Trial counsel testified that introducing evidence of the petitioner's predisposition to violence was not a good trial strategy.

Trial counsel testified that he generally obtained a fairly extensive psychiatric evaluation of his clients, although he did not recall the evaluation in the petitioner's case. During a subsequent hearing on the petition, the State introduced two mental health evaluations which trial counsel had obtained from two different medical professionals. Both evaluations concluded that the defendant was competent to stand trial, able to understand the nature and wrongfulness of his actions, and able to form the *mens rea* required for premeditated murder.

Trial counsel testified that he generally went over plea agreements with his clients several days before the plea date and that the petitioner was emotional at the plea hearing but appeared to understand what was happening. He testified that he had initially tried to get a plea agreement for a life sentence but the prosecution would not agree. He discussed the possible penalties for first degree murder, including a life sentence, with the petitioner. He told the petitioner that under current law, he would be eligible for parole in fifty-one years, but he told the petitioner there was some hope that the law regarding parole might change. He also discussed culpability with the defendant and discussed

types of homicides. The petitioner decided to plead guilty to felony murder.

The post-conviction court denied the petition for post-conviction relief. Finding that the petitioner did not contest the voluntariness of the plea but alleged only ineffective assistance of counsel, the post-conviction court nevertheless concluded that the plea was voluntary. The court found that trial counsel investigated potential mental health defenses and obtained evaluations from two psychologists, both of whom concluded that the petitioner could form the requisite intent for first degree murder. The petitioner pled guilty to felony murder, which did not require the State to prove premeditation. The post-conviction court further found that trial counsel was focused on avoiding the death penalty when negotiating the plea and was successful in doing so. The post-conviction court concluded that trial counsel's performance was not deficient.

The petitioner appeals the denial of the petition, asserting that he was denied the effective assistance of counsel when trial counsel did not prepare a mental health defense and when trial counsel advised him to plead guilty to a life sentence during plea negotiations.[1]

## ANALYSIS

The findings of fact made by a post-conviction court are conclusive on appeal unless the evidence preponderates against them. *Ward v. State*, 315 S.W.3d 461, 465 (Tenn. 2010). "The appellate court's review of a legal issue, or of a mixed question of law or fact such as a claim of ineffective assistance of counsel, is de novo with no presumption of correctness." *Vaughn v. State*, 202 S.W.3d 106, 115 (Tenn. 2006).

A post-conviction petitioner must establish that his conviction or sentence is void or voidable due to the abridgment of any constitutional right. *Id.* Both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee the right to counsel, and the denial of the effective assistance of counsel is a proper ground for post-conviction relief. *Id.* at 115-16. The petitioner bears the burden of proving the allegations of fact in a post-conviction petition by clear and convincing evidence. T.C.A. § 40-30-110 (2010). "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009) (quoting *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998)).

---

[1]The petitioner's claims that his pleas were not knowing and voluntary are all premised on attacks on the performance and advice of counsel.

˘12˘

The right to counsel encompasses "the right to 'reasonably effective' assistance, that is, assistance 'within the range of competence demanded of attorneys in criminal cases.'" *Pylant v. State*, 263 S.W.3d 854, 868 (Tenn. 2008) (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). To show that relief is warranted on a claim of ineffective assistance of counsel, the petitioner must establish both that counsel's performance was deficient and that the deficiency prejudiced the defense. *Finch v. State*, 226 S.W.3d 307, 315 (Tenn. 2007).

To demonstrate deficiency, the petitioner must show that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. *Pylant*, 263 S.W.3d at 868. "In other words, the services rendered or the advice given must have been below 'the range of competence demanded of attorneys in criminal cases.'" *Grindstaff*, 297 S.W.3d at 216 (quoting *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). "Upon our review of counsel's performance, 'we must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time.'" *Finch*, 226 S.W.3d at 316 (quoting *Howell v. State*, 185 S.W.3d 319, 326 (Tenn. 2006)). In evaluating counsel's performance, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland v. Washington*, 466 U.S. 668, 690-91 (1984). The defendant's own statements or actions may determine or substantially influence the reasonableness of counsel's investigation. *Felts v. State*, 354 S.W.3d 266, 277 (Tenn. 2011).

When a petitioner challenges his guilty plea on the basis of ineffective assistance of counsel, the petitioner must prove prejudice by showing that "'there is a reasonable probability that, but for counsel's errors, he would not have pled guilty and would have insisted on going to trial.'" *Grindstaff*, 297 S.W.3d at 216-17 (quoting *Hill v. Lockhart*, 474 U.S. 52, 59 (1985)). "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Vaughn*, 202 S.W.3d at 116 (quoting *Strickland*, 466 U.S. at 694). The court must decide whether any deficiency affected the outcome of the plea process. *Grindstaff*, 297 S.W.3d at 217. The petitioner is not required to demonstrate that the outcome at trial would have been preferable to the plea. *Id.* Failure to show either deficiency or prejudice precludes relief. *Felts*, 354 S.W.3d at 277.

The petitioner contends that trial counsel performed deficiently in not investigating or presenting a defense based on the petitioner's genetic predisposition to violence and his inability to form the correct *mens rea*. The post-conviction court found that trial counsel

˘13˘

investigated a potential defense based on mental illness or diminished capacity and that two psychologists concluded the petitioner was competent to stand trial, able to appreciate the nature and wrongfulness of his actions, and able to form the requisite *mens rea*.[2] Trial counsel spoke with the defendant and his family about his medical history and any possible child abuse, and he did not uncover anything helpful to the defense. *See Felts,* 354 S.W.3d at 277 (noting that the reasonableness of trial counsel's investigation is informed by information provided by the defendant). Accordingly, trial counsel's performance in investigating this defense was not deficient, and the petitioner is not entitled to relief.

The petitioner next claims that his trial counsel did not explain to him that a life sentence meant that he would likely never get out of jail, and he concludes that his plea was not knowing or voluntary as a result. Trial counsel testified that he explained to the petitioner what a life sentence entailed. He stated that he told the petitioner that under current law, he would be eligible for parole in fifty-one years but that there was some possibility that the law would change. At the hearing accepting the guilty plea, the trial court told the petitioner he was agreeing to a sentence of life with the possibility of parole and that under current law, he would be eligible for parole on that conviction in about fifty-one years. The petitioner agreed at the plea hearing that he understood the agreement was for a life sentence. He agreed that the plea agreement called for him to serve a four-year sentence consecutively to the life sentence. The trial court found that the transcript of the plea hearing demonstrated that the petitioner's plea was knowing and voluntary, and it concluded that the plea was made with the advice of competent counsel. In agreeing to be sentenced to life in prison and a consecutive four years, the petitioner avoided the possibility of the death sentence, which the State was pursuing armed with the petitioner's confession and physical evidence including the discovery of the victim's body in the petitioner's vehicle. We conclude that the petitioner has not shown that trial counsel gave him deficient advice regarding plea negotiations or that his guilty pleas were as a result not knowing and voluntary.

## CONCLUSION

---

[2]We accordingly note that the petitioner's brief is simply incorrect in stating that the unrebutted proof shows he could not form the requisite *mens rea*. The record contains two evaluations by psychologists concluding that the petitioner was able to form the requisite *mens rea* for premeditated murder. Further, while Dr. McCoy testified that, in his opinion, the petitioner was incapable of committing premeditated murder, Dr. McCoy did not testify that the petitioner could not form the intent for the underlying felony in the felony murder to which he pled guilty. The petitioner himself testified that he was planning to kill himself that night.

Based on the foregoing, we affirm the post-conviction court's denial of relief.


_____
JOHN EVERETT WILLIAMS, JUDGE